Gholson, J.
The brief statement in the bill of exceptions shows, that a marriage was “ solemnized ” between the plaintiff in error and the person named in the indictment, from which it is to be inferred, that they openly and mutually consented then to become husband and wife; and it is also stated, that thereafter they cohabited as husband and wife. The only defect disclosed by the record is, that the person who “solemnized” the marriage had not the license, or authority, to officiate, required by the statute. The question presented, therefore, is, whether such consent to become husband and wife, followed by cohabitation as husband and wife, constitutes a marriage under the laws of this state ? Whether, but for the incapacity created by the former marriage, the plaintiff in error and the person thus consenting to become husband and wife, and thereafter cohabiting as husband and wife, would have been legally such ?
It will be proper, first, to inquire into the effect, in such a case, of the act regulating marriages. By the ninth section of that act, a penalty is imposed on those authorized to join persons in marriage, who “ shall solemnize the same contrary to the true intent and meaning of this act,” e. g., where notice has not been published, or license obtained, as provided in the sixth section of the act. The ninth section then proceeds: “And if any person, not legally authorized, shall-attempt *555 to solemnize the marriage contract, such person shall, upon conviction thereof, forfeit and pay five hundred dollars, to and for the use of the county wherein such offense was committed.” The change of phraseology will be noticed — “ shall attempt to solemnize.” The statute does not regard it as the solemnization 'of a marriage, and, undoubtedly, the act of the parties derives no additional’strength or force from the attempt to solemnize; the person making such attempt could be regarded, merely as a witness, in view of any effect his presence and co-operation might have on the transaction. But this leaves untouched whatever effect the law might give to the unsolemnized act of the parties. Neither this section, nor any other in the act, prohibits parties from entering into a contract of marriage; and there is no provision that there shall be no marriage unless solemnized as provided in the act, or that a marriage, unless so solemnized, shall be void. We are brought, then, to a rule of construction, which appears to be established by the authorities, that a marriage good at the common law is good notwithstanding the existence of any statute on the subject, unless the statute contains express words of nullity. Bishop on Marriage and Divorce, sec. 167, and cases cited. It is said by the judge in Catterall v. Sweetman, 1 Rob. Ecc. Rep. 304, 317, “ so far as my research extends, it appears that there never has been a decision that any words in a statute, as to marriage, though prohibitory and negative, have been held to infer a nullity, unless that nullity was declared in the act.”
The act of the general assembly is “ an act regulating marriages;” it does not profess to create or confer a right to marry, but only to regulate the exercise of a right, the existence of which is presupposed. The consequences of denying validity and effect to the exercise of the right, would be so serious, that an intention to do so, will not be inferred, but must be clearly expressed.
It is said by Lord Stowell in his celebrated judgment in the case of Dalrymple v. Dalrymple, 2 Hagg. C. R. 54, that— “ Marriage, in its origin, is a contract of natural law ; it may exist between two individuals of different sexes, although no *556 third person existed in the world, as happened in the case of the common ancestors of mankind. It is the parent, not the child of civil society. In civil society it becomes a civil contract, regulated and prescribed by law, and endowed with civil consequences.” This character of the contract of marriage, it is important to bear in mind, when inquiring into the restrictions upon the right to enter into that contract, whether claimed to exist by a positive statute in force at the time of the alleged exercise of the right, or by the adoption into the common law, at an early day, of ecclesiastical rules and directions. If the authority which enunciated such rules and directions, and the continued existence and recognition of which are essential to a compliance with the rules and directions, does not exist in this country, then the very foundation and reason of so much of the common law has ceased, and upon a principle of the common law itself, the rule must cease with its reason, or become inapplicable. If it should be said that positive legislation is a substitute for the rule, then this positive legislation, like the rule, should, in its terms, be restrictive of the natural right, and not merely directory as to the mode of its exercise. If it be not restrictive in its terms, then the rule of construction, founded on the serious and evil consequences that must generally result, from declaring invalid the exercise of the right, will apply.
It would follow, from these views, .that even if we were to admit that the common law was, as pronounced by the judges of England to the house of lords, in the case of the Queen v. Millis, a different rule might be very properly adopted in this state. It was said in that case by Tindal, C.J., that “ by the law of England, as it existed at the time of the passage of the marriage act, a contract of marriage per verba de presentí was a contract indissoluble between the parties themselves, affording to either of the contracting parties, by application to the spiritual court, the power of compelling the solemnization of an actual marriage; but that such contract never constituted a full and complete marriage in itself, unless made in. the presence and with the intervention of a minister in holy orders.” “ By the common law of England it was essential *557 to the constitution of a full and complete marriage, that there must be some religious solemnity; that both modes of obligation should exist together, the civil and the religious; that beside the civil contract, that is, the contract per verla dé presentí, which has always remained the same, there has, at all times, been also a religious ceremony, which has not always remained the same, but has varied from time to time, according to the variation of the laws of the church; with respect to which ceremony, it is to be observed, that whatever, at any time, has been held by the law of the church to be a sufficient religious ceremony of marriage, the same has, at all times, satisfied the common law of England in that respect.” 10 Cl. & Fin. 655. Of the six lords who sat in the case of the Queen v. Millis, three concurred in, and three differed from, the conclusion to which the judges arrived.
In the case of the Queen v. Millis, the question, what was the law of England, independent of their marriage act, as to a contract of marriage, per verla de presentí, was fully discussed, and everything which could properly throw light upon its solution brought forward in the arguments and opinions. All appear to agree, that such a contract of marriage was valid both by the civil law, and the canon law, prior to the Council of Trent, which required, for the first time, the marriage to be in the presence of a priest. The authority of this council was never admitted, or acknowledged, in England. 10 Cl. & Fin. 719-721. But it was claimed, that from the earliest times, and prior even to the acknowledgment of the authority of the pope in England, it was the ecclesiastical law, that such a marriage was only valid to the limited extent before stated, and would not subject a party to a prosecution for bigamy. That as to the validity of marriages the ecclesiastical law controlled, and whenever a question of marriage or no marriage arose', it was referred for decision to the écclesiastical authority. The edicts of the ecclesiastical authorities of a- very early date are referred to, and these are restrictive and prohibitory in their character. “ The council held at Winchester, in the time of Archbishop Lanfranc, in the year 1076, contains a direct and express authority with a nullifying *558 clause, that a marriage without the benediction of the priest, should not be a legitimate marriage, and that other marriages should be deemed fornication. Numerous councils follow, in which are decrees to prevent and punish clandestine marriages, but in no one of which is there any repeal, express or implied, of the rule laid down by the first, viz.: that the presence of the priest is necessary to constitute a legitimate marriage.” Tindal, O.J., 10 C1.& Fin. 682.
Have we a right so to read the second section of our act regulating marriages, which provides that it shall be lawful for any ordained minister of any religious society or congregation, who has a license, or for any justice of the peace, to join together as husband and wife, all persons not prohibited from contracting that relation on account of ag® or consanguinity, as to make it a substitute for the constitution of Lanfranc, and as providing that a marriage shall not be good unless solemnized by a minister or justice of the peace? We think not; for if we could presume that our legislature had in view the common law of England, as declared by the judges in the Queen v. Millis, we can not suppose that, in the absence and abnegation of all ecclesiastical power and authority over civil rights, there would have been a failure to provide some remedy, or to make some provision, in reference to a contract which was so binding as to be “ indissoluble; the parties could not by mutual consent release each other from the obligation.” 10 CL & Fin. 882. The legislature must have proceeded on the idea of the entire inapplicability of any such rule of the common law in this state, where ecclesiastical authority binds those only who render a voluntary submission, or, as is more probable, the rule of the common law in the mind of the legislature was that shown by the certainly prevalent opinion in. England prior to the decision in the Queen v. Millis, and almost universally adopted in this country. Bishop onMarriage andDivorce,sec.l63, and cases cited; 1 Bradford’s Rep. 506 ; 15 New York Rep. 351; 2 California Rep. 503; 30 Missouri Rep. 72; 31 Mississippi Rep. 215.
In either view, we can not construe our statute as restrictive and prohibitory, as invalidating what, by natural law, the *559 general law of society, independent of statutory prohibition, would be regarded a valid marriage. “ Marriage,” said Lord Denman, “ being a civil contract flowing from the natural law, must be taken as lawful till some enactment which annuls it can be produced and.proved by those who deny its lawfulness.” 10 Cl. & Ein. 806.
We come to the remaining question, whether the act of the parties now under consideration was a marriage, and subjected the man, he having a wife then living, to the penalties of the statute against bigamy ? The requisites to constitute a valid marriage, independent of any positive law, have been stated in many authorities, but it must still be a question on the facts of the particular case. It may be, that in most cases a ready answer maybe given upon any statement of the facts, whether there was a marriage or not, and those who were present at the time the consent was given, and cognizant of the conduct, toward each other, of the parties thereafter, could very rarely fail in forming a correct conclusion. But whon it is stated, in general language, that a contract per verba de presentí constitutes a valid marriage, the mind feels .some hesitation in assenting to the naked proposition, and a desire, in language attributed to Lord Eldon, to have it clothed in circumstances. This difficulty was probably felt by Lord Campbell, in giving his opinion sustaining tne validity of the marriage in question in Queen v. Millis, and he began by calling attention to the circumstances, which are analogous to those in this case, the only objection in both, being to the authority of the person who solemnized the marriage. After stating the circumstances, he says: “ Now, this was nota mere betrothment; this was not a mere executory contract per verba de presentí for a marriage thereafter to be solemnized; this was, as it was meant to be, ipsum matrimonium. Here we have not only pacium, not merely sponsalia, hxninuptice per verba de presentí, without any contemplation of a future ceremony as necessary to complete the relation of man and wife.” * * “ The use of the expression ‘ contract of marriage ’ is equivocal, and may mean the actual formation of the relation of husband and wife; but it may mean only an irrevocable engagement to be afterward *560 carried into effect, the parties not meaning then to become husband and wife, and their engagement, therefore, though words in the present tense are used, not amounting to nuptice.”** “In the present case, it is clear that the parties contemplated no farther ceremony completely to constitute the conjugal relation between them, and that they, at the time of the ceremony, intended to become, and believed that they had become, husband and wife.” 10 Cl. & Fin. 749 — 750. “Be it ever borne in mind,” says Lord Brougham in the same case, “ that I do not say all marriages are valid where verba de presentí are used. Those marriages only are so, where the force and effect of the verba de presentí are to bind the parties by this contract, without reference to, or contemplation of, any future ceremony. If the parties plainly contemplate a future solemnization, and only bind themselves in the event of that taking place, then their contract is executory and conditional, not executed and absolute.” Id. 708. ' “A solemn contract of marriage executed per verba de presentí, does in fact constitute a marriage.” Id. 821, Lord Denman. To constitute a marriage, it must appear from the acts of the parties, for words on such an occasion are acts forming a part of the res gestee, that they did, in the homely but strong language of our statute, “join together as husband and wife.”
How this shall appear, in any case in which it is alleged that persons have joined together as husband and wife, without pursuing the mode prescribed by the statute, must depend on the circumstances. There must be a contract of present marriage — it must appear that the woman was taken as a wife, and that the man was taken as a husband. The circumstances of publicity in entering into the contract, and of cohabitation thereafter as husband and wife, are most important to show the intent with which any words were used, and without such circumstances, under the manifest policy of our laws on the subject, and the habits and feelings of our people, an intent to form the honorable relation of marriage could not be properly found. In this case those circumstances are clearly shown. It was a contract of present marriage — openly made. *561 and followed by cohabitation as husband and wife — and we think was a valid marriage under the laws of this state.
Being a valid marriage for other purposes-^conferring on the parties the rights of husband and wife — we see no reason why the party whose incapacity, from having another wife living, rendered the contract of marriage a nullity, should escape on the ground of a want of form, from the. penalties of the statute against bigamy. On the contrary, if such a marriage be legal for other purposes, it would be dangerous in the extreme, to allow the mere form of the marriage to become a shield to protect those who commit such a crime.
The judgment of the court of common pleas will be affirmed.
Judgment affirmed.
Sutlifp, C.J., and Peck, Bbinkbri-iofe and Scott, J J., concurred.